OBENCHAIN
CORPORATION, Plaintiff,

v.

CORPORATION NACIONALE de IN-VERSIONES, a/k/a Conadi, Fundiciones-Centroamericanas S.A., Republic of Honduras, Angel Eduardo Ramos, Roberto Ramon Castillo, Augusto C. Coello, Carlos A. Mendoza, Juan C. Marinakys, Norman Garcia, Hector Cordova, Roberto Galvez Barnes, and Justo Pastor Calderon, Defendants.

Civ. A. No. 86–846.

United States District Court,
W.D. Pennsylvania.

March 18, 1987.

Kathleen S. McAllister, Jones Gregg Creehan & Gerace, Pittsburgh, Pa., for plaintiff.

David G. Ries, Thorp Reed & Armstrong, Pittsburgh, Pa., for defendants.

OPINION

GERALD J. WEBER, District Judge.

In this age of multinational corporations, with investment opportunities in every corner of the globe, plaintiff picked Honduras. Plaintiff sorrowfully rues that decision and turns its frustrated energies to litigation in an effort to recoup at least some of its losses.

Defendants on the other hand are understandably reluctant to air their failed business ventures in a United States Federal Court. Like a Honduran "Dorothy" they wanted the wizard to send them home. By motion to dismiss, defendants have challenged both personal and subject matter jurisdiction in this forum.

## FACTS

A detailed history of the parties' relationship and experiences is not necessary at this time, but a review of the salient facts is in order.

In 1974, the Republic of Honduras by statute created the Corporacion Nacionale de Inversiones, better known by the acronym, CONADI. The purpose of CONADI was to promote economic development in Honduras, and while CONADI claims to be a separate corporate entity, the Honduran Republic has retained at least general supervisory control.

In 1976, plaintiff, a Pennsylvania corporation, or its Panamanian subsidiary, came to Honduras in search of a way to improve its corporate profit and loss statement. To this end, plaintiff (or its subsidiary) negotiated an agreement with CONADI to design, construct and operate an iron and steel foundry in San Pedro Sula, Honduras. The principals agreed to create a separate Honduran corporation, Funduciones-Centroamericanas, S.A., to serve as the operating company. In the course of the project, some or all of the parties renegotiated certain aspects of the agreement and it is these several contracts which form the basis of plaintiff's claim.

We will not now go into the disagreeable details of the project's demise. Though there appears to be much dispute about the course of events, all parties agree that the experience was not a happy one. Suffice it to say that the fledgling Honduran steel industry died an inglorious and premature death.

In this action, plaintiff alleges that CONADI and Fundiciones breached the contracts in several respects. Plaintiff also contends that CONADI guaranteed the obligations of Fundiciones, and Honduras in turn guaranteed the obligations of CONADI. The various individual defendants are identified as directors or officers of CONADI, or Fundiciones or both, and plaintiff alleges that they fraudulently misrepresented material facts concerning the project and its financing.

## DISCUSSION

### I. Service of Process

First the technical argument. Defendants contend that plaintiff failed to make service of process in compliance with the strictures of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 et seq. Section 1608 provides specific and detailed procedures for service. Plaintiff admits that it failed to comply with the Act in two respects. Plaintiff served the complaint rather than having the Clerk of Courts perform that function as required by the Act, and plaintiff did not include the required notice of suit.

Defendants argue that the FSIA requirements are strict and failure to follow them, even if only a technical violation, deprives the court of jurisdiction. Several courts have agreed. *Gray v. Permanent Mission of the People's Republic of the Congo to the United Nations,* 443 F.Supp. 816 (S.D. N.Y.), aff'd 580 F.2d 1044 (2nd Cir.1978); *Magnus Electronics, Inc. v. Royal Bank of Canada,* 620 F.Supp. 387 (N.D.Ill.1985); *Unidyne Corp. v. Aerolineas Argentinas,* 590 F.Supp. 398 (S.D.Va.1984).

■ However, the better rule permits the assertion of personal jurisdiction where substantial compliance has effected actual notice. *Velidor v. L/P/G Benghazi,* 653 F.2d 812 (3d Cir.1981); *Harris Corp. v. National Iranian Radio & Television,* 691 F.2d 1344, 1352, n. 16 (11th Cir.1982); *Banco Metropolitano v. Desarrollo de Autopistas,* 616 F.Supp. 301, 304 (S.D.N.Y. 1985). The purpose of the Act's requirements is to ensure actual notice to foreign states of the fact and substance of pending litigation. Where a party has received such notice, despite technical omissions in the manner of service, the purpose of the Act if not its letter has been satisfied. *Velidor,* 653 F.2d at 821.

■ We are also cognizant of the fact that any flaws in service may be corrected, but we will not require the plaintiff, his counsel and the Clerk of Court to go through an empty ritual to serve parties who have received actual notice. While we do not condone the omissions of plaintiff's

counsel, nothing of substance will be accomplished by ordering a meaningless act.

Unfortunately for plaintiff, not all parties have been served. The docket reflects no proof of service on Fundiciones, and no one has entered an appearance for that entity. Therefore, unless plaintiff now establishes service in the manner required by the FSIA, Fundiciones will be dismissed.

## II. Sovereign Immunity

Defendants seek to wrap themselves in the once magical cloak of sovereign immunity. However, as a reflection of an interdependent world economy and the expanding role of governments, the Foreign Sovereign Immunities Act has broadly defined areas of accountability for modern sovereigns.

We may begin with the premise embodied in the FSIA that foreign states, their agencies and instrumentalities are immune from suit in the state and federal courts of the United States, with certain defined exceptions. 28 U.S.C. §§ 1604, 1605. In the absence of an international agreement to the contrary, jurisdiction may be exercised only on occasion of an exception delineated in the Act.

Plaintiff seeks to defeat the sovereign immunity bar with the exceptions listed in § 1605(a)(2):

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case— ...
>
> (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States; ...

These provisions have been the subject of much learned discussion, particularly since the legislature has left the interpretation of these broad brush phrases to the courts.

The most cogent statement of a framework for analysis of issues arising under the FSIA is the decision in *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300 (2d Cir.1981). The court identified 5 pertinent questions:

1) Does the conduct the action is based upon or related to qualify as "commercial activity"?

2) Does that commercial activity bear the relation to the cause of action and to the United States described by one of the three phrases of § 1605(a)(2), warranting the Court's exercise of subject matter jurisdiction under § 1330(a)?

3) Does the exercise of this congressional subject matter jurisdiction lie within the permissible limits of the "judicial power" set forth in Article III?

4) Do subject matter jurisdiction under § 1330(a) and service under § 1608 exist, thereby making personal jurisdiction proper under § 1330(b)?

5) Does the exercise of personal jurisdiction under § 1330(b) comply with the due process clause, thus making personal jurisdiction proper?

This framework has been adopted by the Third Circuit. *Velidor v. L/P/G Benghazi*, 653 F.2d 812 (3d Cir.1981). We now apply it here.

### A) Commercial Activity

"Commercial activity" is defined by the FSIA at 28 U.S.C. § 1603(d):

> (d) A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

The provision is circular because it fails to define "commercial", leaving the courts to wrestle with the traditional distinction between "commercial" and "governmental".

Defendants have argued that their activity has been wholly governmental in character, designed and intended not for profit, the alleged sine qua non of "commercial" conduct, but for the goal of spurring eco-

nomic development in an underdeveloped country. Defendants purpose then was the advancement of the common weal.

By making the argument, defendants ignore the one clear thing that § 1603(d) does tell us—that the purpose of the activity is irrelevant. Rather, heeding the distinction imposed by the Act, we must look to the "nature" of the activity apart from its purpose.

In this sense then the purchase of goods and services, regardless of their ultimate purpose, is commercial in nature. In *Texas Trading*, the court reviewed legislative history, pre-FSIA decisions and international law to adopt the following:

> If a government department goes into the market places of the world and buys boots or cement—as a commercial transaction—that government department should be subject to all the rules of the marketplace.

647 F.2d at 310, quoting *Trendtex Trading Corp. v. Central Bank of Nigeria*, 2 W.L.R. 356, 369, 1 All E.R. 881 (1977).

■ In *Texas Trading* the court concluded that Nigeria's purchases of huge quantities of cement, ostensibly for such public functions as road construction, constituted "commercial activity". Without regard to purpose, the determinative factors were that defendant had entered the marketplace seeking goods and services and had negotiated, bargained and contracted for those goods and services it desired.

■ Similarly then, the activity of defendants in the case at bar constitutes commercial activity. Defendants sought goods, services *and* private investors for this venture. Defendants negotiated and contracted for the acquisition of goods, services and investment capital, thereby advancing their goals through the marketplace. In addition, we note that this was an undeniably commercial venture, the creation of a steel foundry. It involved private investors presumably looking for a profit and CONADI owned 51% of the operating company, making it the largest winner financially if the project succeeded. It is clear then on the facts of record that Honduras and its agents were more than mere financial conduits for development assistance funds but were in fact intimately engaged in a commercial activity.

### B) § 1605(a)(2) Exceptions

Having established the first leg under the FSIA, we turn to the Act's enumerated exceptions. To reiterate, the FSIA at 28 U.S.C. § 1605(a)(2) provides exceptions to the sovereign immunity bar for those cases:

> (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States; ...

Plaintiff claims that one or all of these three exceptions establishes this court's jurisdiction over the defendants.

It is undisputed that defendants engaged in some activities in this country in furtherance of the foundry project. Defendants or their agents traveled to Pennsylvania to inspect plaintiff's operation and to negotiate the contract which forms the basis of this action. The question is whether these acts satisfy the exceptions provided by § 1605(a)(2).

The first two clauses of that section permit the assertion of jurisdiction when the foreign state conducts commercial activity in the United States, or when the foreign state performs acts in the United States in furtherance of commercial activity elsewhere. Of course the mere pursuit of commercial activity in the United States will not constitute waiver of immunity, but rather, there must be a nexus between plaintiff's grievance and the sovereign's commercial activity. *Velidor v. L/P/G Benghazi*, 653 F.2d 812, 815 (3d Cir.1981); *Sugarman v. Aeromexico, Inc.*, 626 F.2d 270 (3d Cir.1980).

■ It appears to us that one or both of these first two exceptions is satisfied here.

The inspection trip and negotiations, if not "commercial activity carried on in the United States" within the meaning of the Act, are certainly acts in the United States in furtherance of commercial activity in Honduras. Furthermore, there is a close nexus between plaintiff's claims and the defendants' acts in the United States—plaintiff's suit is based on the contractual relationship which resulted from those negotiations. See *Gibbons v. Udaras na Gaeltachta,* 549 F.Supp. 1094 (S.D.N.Y.1982).

Defendants argue that the contracts were executed in Honduras and a breach, if one occurred, occurred in Honduras. However, the situs fiction of contract formation is irrelevant under the FSIA, *Gibbons,* 549 F.Supp. at 1114, n. 9, and the location of the breach is likewise immaterial. *Velidor,* 653 F.2d at 820; *Sugarman,* 626 F.2d at 273. This suit arises on a contract or series or contracts which derive at least in part from negotiations between the parties occurring in this country. See *Gibbons,* 549 F.Supp. at 1114.

The third clause of § 1605(a)(2) also permits the assertion of jurisdiction here. That clause provides an exception to immunity where the foreign defendant's acts, though outside the United States, cause a "direct effect" within the United States. Here plaintiff complains that it has suffered a direct financial loss in this country as a result of defendants' conduct.

There is some dispute among the courts as to whether economic injury alone will satisfy the "direct effect" requirement. Several courts have refused to find jurisdiction where the only direct effect in the United States is financial loss by the plaintiff. *Magnus Electronics, Inc. v. Royal Bank of Canada,* 620 F.Supp. 387 (N.D.Ill. 1985); *Exchange National Bank of Chicago v. Empresa Minera del Centro del Peru, S.A.,* 595 F.Supp. 502 (S.D.N.Y. 1984).[1]

■ We prefer the view of the Second Circuit in *Texas Trading,* 647 F.2d at 312. A corporation wronged in a commercial transaction suffers only financial injury. Even those more intangible injuries, such as damage to business reputation, are nothing more than another formulation of an aspect of financial injury. The relevant question then is whether the injury to plaintiff is direct.

Defendants have argued that the loss in this case was sustained by plaintiff's Panamanian subsidiary. If true, such a loss would be indirect to plaintiff and would not satisfy § 1605(a)(2). See, *Carey v. National Oil Corp.,* 592 F.2d 673 (2d Cir.1979). However, defendants have been unable to establish this premise with the evidence presented and since foreign states bear the burden of establishing immunity we cannot deny jurisdiction on this ground. E.g. *Transamerican S.S. Corp. v. Somali Democratic Republic,* 767 F.2d 998 (D.C. Cir.1985); *Vencedora Oceanica Navigacion S.A. v. Compagnie Nationale Algerienne de Navigation,* 730 F.2d 195 (5th Cir.1984).

For the reasons stated we conclude that the exceptions stated in the FSIA at 28 U.S.C. § 1605(a)(2) apply to all defendants.

### III. Minimum Contacts

Questions 3 and 4 of the *Texas Trading* framework are easily resolved. This litigation is plainly within this court's "judicial power" created by Article III, and we have earlier determined that actual service will suffice to establish personal jurisdiction, even if § 1608 was not strictly followed.

We come then to an analysis of minimum contacts. Even if the exceptions to immunity under the FSIA are satisfied, we must determine if jurisdiction over the foreign defendants comports with due process. *Velidor,* 653 F.2d at 819, n. 12; *Texas Trading,* 647 F.2d at 313. Simply put, do defendants have sufficient minimum contacts with the United States to justify the assertion of jurisdiction over them.

■ As mentioned above, a mere economic impact on a United States plaintiff, without other contact by the foreign de-

---

1. Although the concepts tend to overlap it appears that these decisions are grounded in a minimum contacts analysis rather than an interpretation of the FSIA, and we will discuss them in this context infra.

fendant with the United States, will not satisfy requirements of due process, although it may satisfy one of the sovereign immunity exceptions of § 1605(a)(2). See, *Magnus Electronics*, 620 F.Supp. 387; *Exchange National Bank*, 595 F.Supp. 502. Here there is no question that defendants or their agents engaged in activities in the United States which contributed to the agreements which form the basis of this action. Defendants availed themselves of the benefits of the marketplace in this forum to further their endeavors and such activity will suffice for the minimum contacts requirement.

Defendants argue that the only contacts with the United States were undertaken by and for Fundiciones alone, and that CONADI and the Republic were merely passive guarantors and had no contact with the United States in this matter.

CONADI's passivity is hardly apparent. CONADI created and owned a majority interest in Fundiciones, and the two shared many common officers and agents. But, in any event, by defendants' own admission Fundiciones was an agent of the sovereign, created to accomplish the government's objective of economic development. The acts of Fundiciones and its agents were performed for the benefit of CONADI and the Republic. In these circumstances the acts of the agent will be attributed to the principal in assessing minimum contacts. *Texas Trading*, 647 F.2d at 314; *Gibbons*, 549 F.Supp. at 1114, n. 10.

■ The individual defendants have also challenged jurisdiction on the ground that they lack the requisite minimum contacts with the forum. Plaintiff has not directed us to any evidence to establish contacts between the United States and the individual named defendants. Also, acts of an individual in his corporate capacity will not subject the individual to personal jurisdiction. E.g., *Techno Corp. v. Dahl Associates, Inc.*, 521 F.Supp. 1036 (W.D.Pa.1981) and 535 F.Supp. 303 (W.D.Pa.1982). Finally, we note that plaintiff's claims against the individual defendants are based on allegations of misrepresentations made in Honduras concerning the financial health of the Honduran corporations and the Honduran bankruptcy process. None of these averments reveal any minimum contacts with the United States which have the requisite nexus with the asserted cause of action. The individual defendants will therefore be dismissed for lack of personal jurisdiction.

## IV. Forum Non Conveniens

Defendants move to dismiss on a forum non conveniens theory. Defendants argue that this forum is inconvenient for them and potential witnesses, and since Honduran law is applicable, the matter should be tried in a Honduran court.

■ We have not yet determined what law is applicable but even if it is necessary to interpret Honduran law, we do not see this as an insurmountable obstacle. As for convenience of the parties, the scales are even. Regardless of the forum some parties and witnesses will be inconvenienced by travel and distance. However, we perceive no prejudice or serious impediment to defendants' proceeding in this forum. In fact defendants' agents or officers found no difficulty in entering this forum to conduct business, so they cannot complain that they cannot defend here. All things being equal then, the plaintiff's choice of forum will not be disturbed.

## CONCLUSION

The corporate defendants and the Republic of Honduras are subject to the jurisdiction of the court under exceptions to sovereign immunity defined by the FSIA and under a minimum contacts analysis of due process. The individual defendants will be dismissed for lack of personal jurisdiction.

Service of process did not comply with the FSIA, but will suffice where actual notice was received. Service upon Fundiciones must be effected in accordance with the Act, within 60 days, or the defendant will be dismissed.

The plaintiff's choice of forum will not be disturbed.

An appropriate order will be entered.